**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Crim. No. DLB-23-213 |
| BRIAN MALIK OXLEY, | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM OPINION**

Brian Malik Oxley has been indicted for knowingly possessing a machinegun in violation of 18 U.S.C. § 922(o). Oxley has moved to dismiss the indictment on the ground that the federal criminal statute is unconstitutional on its face and as applied to him. Because § 922(o) is constitutional on its face and as applied to Oxley, the Court denies the motion.

**I.    Background**

Under 18 U.S.C. § 922(o), it is "unlawful for any person to transfer or possess a machinegun," with limited exceptions for transfer or possession under government authority and weapons lawfully possessed before the statute's effective date. For purposes of § 922(o), a "machinegun" has the meaning of the term as used in the National Firearms Act: a firearm that can fire "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(24). The definition extends to "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

On June 15, 2023, a grand jury sitting in the District of Maryland indicted Oxley on one count of violating § 922(o) by knowingly possessing a "Glock, Model 17, 9mm Luger caliber pistol with a full-automatic switch installed." ECF 1. On January 22, 2024, Oxley moved to dismiss the indictment on Second Amendment grounds. ECF 35. The United States opposed the motion. ECF 41. Oxley replied. ECF 44. The Court ordered supplemental briefing. ECF 55. Briefing is now complete. *See* ECF 67 & 70. No hearing is necessary. *See* Loc. R. 105.6 & 207.1 (D. Md. 2025); ECF 44, at 5 n.2. For the following reasons, Oxley's motion to dismiss the indictment is denied.

## II.     Standard of Review

Rule 12 of the Federal Rules of Criminal Procedure allows a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A court "may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution.'" *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quoting *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010)). "An indictment is defective if it alleges a violation of an unconstitutional statute." *United States v. Brown*, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010) (citing *The Civil Rights Cases*, 109 U.S. 3, 8–9 (1883)).

## III.     Discussion

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has construed the Second Amendment to secure a limited individual right to possess a firearm. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

Congress has criminalized the possession of a type of firearm—the machinegun—in 18 U.S.C. § 922(o). Oxley argues that § 922(o) violates the Second Amendment on its face and as applied to him.

### A. Oxley's Facial Challenge

"A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). "That means that to prevail, the Government need only demonstrate that [the challenged statute] is constitutional in *some* of its applications." *United States v. Nutter*, 137 F.4th 224, 229 (4th Cir. 2025) (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)). "To succeed in a facial constitutional challenge, a movant 'must establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Oxley has not made that showing here.

The Supreme Court has adopted a two-part test to determine whether a statute violates the right to bear arms under the Second Amendment. *See New York Rifle & Pistol Ass'n v. Bruen*. 597 U.S. at 24; *see also United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc); *Bianchi v. Brown*, 111 F.4th 438, 445–46 (4th Cir. 2024) (en banc). First, a court must determine whether the "plain text" of the Second Amendment covers the conduct the statute restricts. *Bruen*, 597 U.S. at 24. "If the text does not extend to the desired conduct, that conduct falls outside the ambit of the Second Amendment, and the government may regulate it." *Bianchi*, 111 F.4th at 446. If the text covers the conduct, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. In that case, the Court proceeds to a second step wherein the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

### 1. *Bruen* Step One

Under *Bruen*'s first step, the Court asks "whether the Second Amendment's plain text covers the conduct at issue." *Price*, 111 F.4th at 398. "If not, that ends the inquiry: the Second Amendment does not apply." *Id.* Oxley's facial challenge to § 922(o) fails at step one of the *Bruen* test because machineguns are not "Arms" protected by the Second Amendment.

At first glance, the text of the Second Amendment may not appear to cabin the scope of the word "Arms" at all. *See Bianchi*, 111 F.4th at 447. But "that text cannot be read in a vacuum," and the Second Amendment "is 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* at 446 (quoting *Bruen*, 597 U.S. at 21). Just as the First Amendment does not protect all "speech" because its text is read "against a backdrop of laws and societal understandings that circumscribed" certain speech, the Second Amendment does not protect a right to bear all "Arms"—its text must be read "against its historical and legal backdrop." *Id.* at 447–48. Indeed, the Fourth Circuit has stressed that "we can only properly apply step one of the *Bruen* framework by looking to the historical scope of the Second Amendment right." *Price*, 111 F.4th at 401; *see also Bianchi*, 111 F.4th at 448 ("What we must do under *Bruen*, then, is assess the historical scope of the right to keep and bear arms to determine whether the text of the Second Amendment encompasses the right to possess the assault weapons at issue."). "[T]he most relevant limitation" here is that the Second Amendment "'extends only to certain types of weapons.'" *Bianchi*, 111 F.4th at 450 (quoting *Heller*, 554 U.S. at 623).

Against this backdrop, *Bruen*'s step-one inquiry into whether the Second Amendment's plain text covers the conduct at issue involves three questions: "(1) whether the [defendant] [is] 'part of the people whom the Second Amendment protects'; (2) whether the weapons regulated by the challenged regulation [a]re 'in common use' for a lawful purpose . . .; and (3) whether the

Second Amendment protect[s] the [defendant's] 'proposed course of conduct.'" *See Price*, 111 F.4th at 400 (quoting *Bruen*, 597 U.S. at 31–32). The second question is "outcome determinative"—that is, if a weapon is "not in common use for a lawful purpose," it "fall[s] outside the scope of the Second Amendment's protection." *Id.* at 402, 408.

A weapon is not in common use for a lawful purpose if it is "dangerous and unusual." *See Bianchi*, 111 F.4th at 451 (describing how "[a] corollary to 'the historical tradition of prohibiting the carrying of dangerous and unusual weapons' is that 'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes'" (citation modified) (quoting *Heller*, 554 U.S. at 625, 627)); *see also United States v. Simmons*, 143 F.4th 200, 207 (4th Cir. 2025) ("[A]rms in common use for a lawful purpose enjoy Second Amendment protection, but 'dangerous and unusual weapons' do not." (quoting *Heller*, 553 U.S. at 627)).[1] "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Bianchi*, 111 F.4th at 445 (quoting *Heller*, 554 U.S. at 625). And "'dangerous and unusual weapons' that are not 'in common use' can be prohibited." *Id.* (quoting *Heller*, 553 U.S. at 627). Unlike the arms commonly used by private individuals for the lawful purpose of self-defense, dangerous and unusual weapons historically "could be banned without infringing upon the right to bear arms." *Bianchi*, 111 F.4th at 450. That is because "excessively dangerous arms were not reasonably related or proportional to the end of self-defense—but rather were better suited for offensive criminal or military purposes." *Id.* (citing *Heller*, 554 U.S. at 627). "What brings all the weapons beyond the scope of the Second Amendment together . . . is their ability to inflict damage on a scale or in a manner disproportionate

---

[1] Oxley asserts in his reply that the "dangerous and unusual" inquiry "properly belongs" in *Bruen*'s second step. *See* ECF 44, at 3. In *Bianchi*, the Fourth Circuit engaged in this inquiry at step one of the *Bruen* test. *See* 111 F.4th at 452–53.

to the end of personal protection." *Id.* Such weapons are "most suitable for criminal or military use." *Id.* at 451.

Applying this standard to the regulated weapons at issue here, the Court finds that machineguns are not "Arms" protected by the Second Amendment. The Supreme Court and Fourth Circuit have made clear that a machinegun is not a weapon in common use for a lawful purpose. In *Heller*, for example, the Supreme Court indicated that "weapons that are most useful in military service—M–16 rifles and the like—may be banned," and noted that it would be "startling" to read its binding precedent to render the National Firearms Act's restrictions on machineguns to be "unconstitutional." [2] 554 U.S. at 624, 627; *cf. Staples v. United States*, 511 U.S. 600, 611–12 (1994) ("[W]e might surely classify certain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation— as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades . . ."). An en banc Fourth Circuit has said the same. *See Price*, 111 F.4th at

---

[2] Oxley asserts that this language in *Heller* is merely dicta. While the court is "not bound by dicta or separate opinions of the Supreme Court," *Myers v. Loudon Cnty. Pub. Schs.*, 418 F.3d 395, 406 (4th Cir. 2005), it also "cannot ignore the Supreme Court's explicit guidance simply by labeling it 'dicta,'" and instead must "afford [it] 'great weight,'" *Hengle v. Treppa*, 19 F.4th 324, 346 (4th Cir. 2021) (quoting *Fusaro v. Cogan*, 930 F.3d 241, 254 (4th Cir. 2019)). This Court "is 'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *See United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). To be sure, the Fourth Circuit has been reluctant to give Supreme Court dicta "talismanic effect" when it is "unaccompanied by any analysis from which we might gain insight into the Court's reasoning." *See In re Bateman*, 515 F.3d 272, 282–83 (4th Cir. 2008). But "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003)). Thus, Oxley cannot circumvent this "explicit guidance" from the Supreme Court, *see Hengle*, 19 F.4th at 346, particularly when *Heller*'s statements about machineguns are supported by analysis, *see, e.g.*, 554 U.S. at 624–25. Regardless, the Court does not base its finding that machineguns fall outside of the Second Amendment's protections on these statements alone.

403 ("We know from Supreme Court precedent that . . . machineguns are not in common use for a lawful purpose . . ." (citing *Heller*, 554 U.S. at 625, 629)); *cf. United States v. Bridges*, No. 24-5874, 2025 WL 2250109, at *9 (6th Cir. Aug. 7, 2025) ("Machineguns are both dangerous and unusual—not weapons typically possessed by law-abiding citizens for lawful purposes."). And a panel of the Fourth Circuit recently noted that *Heller*—along with an older Supreme Court case upholding restrictions on short-barreled shotguns, *United States v. Miller*, 307 U.S. 174 (1939))—"would foreclose any constitutional challenge" to possession of a weapon considered a "machinegun" under the National Firearms Act. *See Simmons*, 143 F.4th at 204 & n.1, 207.

Even if these statements from the Supreme Court and Fourth Circuit were not enough to preclude Oxley's facial challenge to § 922(o), the Fourth Circuit's recent ruling in *Bianchi v. Brown* confirms that machineguns are in the class of dangerous and unusual weapons afforded no Second Amendment protection. In *Bianchi*, the Fourth Circuit upheld Maryland's Firearms Safety Act of 2013 ("FSA") against a facial Second Amendment challenge. 111 F.4th at 441–42. The FSA prohibits the possession of an "assault weapon," defined as an "assault long gun," "assault pistol," or a "copycat weapon." *Id.* at 442 (quoting Md. Code Ann., Crim. Law § 4-301(d)). These phrases, in turn, are defined to include certain semiautomatic weapons. *See id.* at 442–43. A semiautomatic weapon "fires only one shot with each pull of the trigger, and . . . requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples*, 511 U.S. at 602 n.1.

At the first *Bruen* step, the *Bianchi* Court held that the Second Amendment does not protect the right to possess many of the assault weapons covered by the FSA. *See id.* at 452–53. The court emphasized that "[t]he Second Amendment, with its 'central component' of 'individual self-defense,' is not concerned with ensuring citizens have access to military-grade or gangster-style

weapons." *Id.* at 452 (quoting *Bruen*, 597 U.S. at 29). Accordingly, "while the Second Amendment jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense, it emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Id.*

The *Bianchi* Court found that "[m]any of the firearms" covered by the FSA are "'dangerous and unusual weapons' that are not 'in common use today for self-defense.'" *Id.* at 452–53 (quoting *Bruen*, 597 U.S. at 21, 32). These weapons had "firepower far exceeding the needs of the typical self-defense situation," making the "weapons 'most useful in military service.'" *Id.* at 453 (quoting *Heller*, 554 U.S. at 627). The court highlighted characteristics of some of the covered weapons that make them ill-suited for self-defense and more apt for military service and criminal activity. For example, the Barrett .50 caliber semiautomatic sniper rifle has the "'capab[ility] of long range destruction'" that has "helped Mexican cartels outgun police." *Id.* (quoting Bar Ass'n of S.F. Special Comm. on Gun Violence, A.B.A., *Restriction of Sale of .50 Caliber Sniper Weapons* (Aug. 7, 2005)). Much of the court's analysis focused on the AR-15 rifle. The court emphasized, for instance, that AR-15s "and similar assault rifles" pose unique dangers to law enforcement due to their ability to "penetrate police body armor," *id.* at 457; that AR-15s can "pass[] through their intended target and impact[] a point beyond it," *id.* at 458; and that an AR-15's high-velocity rounds can cause "'catastrophic' damage" which "'often cannot be repaired' by trauma surgeons." *Id.* at 455 (quoting *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 599–600 (D. Del. 2023)). The court also stressed that AR-15s are disproportionately used in mass shootings and terrorist attacks. *Id.* at 456.

One of the AR-15 features the *Bianchi* Court found ill-suited for self-defense was its "compatib[ility] with up to 100-round magazines." *Id.* at 455, 458–59. "[C]ivilian self-defense

rarely—if ever—calls for the rapid and uninterrupted discharge of many shots," and "most homeowners only use two to three rounds of ammunition in self-defense." *Id.* at 459 (first quoting *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45 (1st Cir. 2024); and then quoting *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121 n.25 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 597 U.S. 1). The *Bianchi* Court pointed to a study that citizens fire, on average, only two shots in self-defense, and 97 percent of the time they fire five shots or less. *Id.* (citing *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 96 (D. Conn. 2023)). Consequently, "[t]he large magazines that are integral to the AR-15's effectiveness in combat and mass murder are . . . ill-suited for typical self-defense scenarios." *Id.* at 458–59.

*Bianchi*'s conclusion that the Second Amendment does not cover these semiautomatic assault weapons applies to machineguns. Just as the semiautomatic weapons covered by the FSA are "excessively dangerous weapons ill-suited and disproportionate" for self-defense, so too are machineguns. *See id.* at 452. "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (citing George C. Wilson, *Visible Violence*, 12 Nat'l J. 886, 887 (2003)). The *Bianchi* Court found that the AR-15's compatibility with large-capacity magazines and ability to fire many "'rapid and uninterrupted . . . shots'" rendered it ill-suited for self-defense and more effective for "combat and mass murder"—in other words, this capability made the AR-15 a dangerous and unusual weapon. *See* 111 F.4th at 459 (quoting *Ocean State Tactical*, 95 F.4th at 45); *see also id.* at 451–52. If this characteristic makes an AR-15—a semiautomatic weapon— dangerous and unusual, a machinegun—a fully automatic weapon—is even more so. While semiautomatic weapons "require[] repeated trigger engagement," *id.* at 482 (Gregory, J., concurring in the judgment), fully automatic weapons "fire[] repeatedly with a single pull of the

trigger"—"once its trigger is depressed, [a fully automatic weapon] will automatically continue to fire until its trigger is released or the ammunition is exhausted," allowing for even less interruption between shots, *see Staples*, 511 U.S. at 602 n.1; *see also* 26 U.S.C. § 5845(b) (defining "machinegun" under the National Firearms Act as a firearm that can fire "automatically more than one shot, without manual reloading, by a single function of the trigger"); 18 U.S.C. § 921(a)(24) (incorporating the National Firearms Act definition of "machinegun" for purposes of § 922(o)). Machineguns are more lethal than AR-15s because "the AR-15 fires much slower than a machine gun." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev. 1, 20 (2020). As the Ninth Circuit put it, "[s]hort of bombs, missiles, and biochemical agents, [the court] can conceive of few weapons that are more dangerous than machine guns." *Henry*, 688 F.3d at 640; *cf. United States v. O'Brien*, 560 U.S. 218, 230 (2010) (describing "[t]he immense danger posed by machineguns").

Oxley argues that a machinegun "self-evidently could prove useful in self-defense," ECF 35, at 2, yet he fails to explain how the weapon is suitable and proportionate for this purpose. A weapon that can fire more than 1,000 rounds per minute, *see Henry*, 688 F.3d at 640, "could prove useful in self-defense," ECF 35, at 2, but it is not *suitable* for self-defense. If the Second Amendment protected a weapon merely because it could prove useful in self-defense, nearly every weapon would enjoy constitutional protection. Yet "some bearable arms deliver force so excessive for self-defense that no reasonable person could posit that the Constitution guarantees civilian access to them." *Bianchi*, 111 F.4th at 451. No reasonable person could credibly maintain that the Constitution guarantees civilians access to a machinegun—a veritable killing machine. A machinegun's automatic firing capability makes it "excessively dangerous" and "not reasonably related or proportional to the end of self-defense"—it is "better suited for offensive criminal or

military purposes." *See Bianchi*, 111 F.4th at 450; *see also Price*, 111 F.4th at 406 ("[T]he lethality of a machinegun has led the Supreme Court to conclude that such weapons are best suited for war, not self-defense."); *cf. Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (describing how fully automatic weapons "were developed for the battlefield and were never in widespread civilian use in the United States"). Even the dissent in *Bianchi* affirmed that machineguns have "long been linked to criminal activity" and are among the "dangerous *and* unusual" weapons which "c[an] be banned": "That is why *Heller* could say that laws banning weapons like short-barreled shotguns and machine guns are constitutional." *Bianchi*, 111 F.4th at 523 (Richardson, J., dissenting).

Oxley also argues that machineguns are in common use—and thus not dangerous and unusual—because of the large number of machineguns currently owned by Americans. Oxley cites to a statistic from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that shows there were 741,146 registered machineguns nationwide as of May 2021. *See* ATF, U.S. Dep't of Justice, *Firearms Commerce in the United States – Annual Statistical Update 2021* 15–16 (2021), https://www.atf.gov/resource-center/docs/report/2021-firearms-commerce-report/download [https://perma.cc/K9JG-TU7K]. This statistic, Oxley insists, demonstrates that machineguns are not dangerous and unusual because courts have found weapons owned in lower quantities to be in common use. Specifically, Oxley points to *Caetano v. Massachusetts*, where Justice Alito concluded in his concurrence that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country" in part because, as of 2009, roughly 200,000 civilians owned stun guns. 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment). Oxley also cites *Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018), where the Eastern District of New York found that nunchaku were in "common use" based on data that 64,890 were sold on the

retail market between 1995 and 2018, and *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019), where the Northern District of New York concluded that a statistic showing that citizens owned 300,000 tasers demonstrated that tasers were in common use. Oxley reasons that because the number of people who currently own machineguns outpaces the number of people who owned other weapons found to be in common use, machineguns also must be in common use and therefore not dangerous and unusual. Further, Oxley argues, the 741,146 figure is a "significant undercount of the number of machineguns Americans *would* lawfully possess for self-defense purposes, had Congress not unconstitutionally prohibited them from doing so." ECF 35, at 6.

The *Bianchi* Court squarely rejected the raw numbers game Oxley asks the Court to play. The appellants, challengers of the FSA, argued that the weapons were "in common use" and could not be prohibited because millions of individuals owned assault rifles covered by the FSA. *Bianchi*, 111 F.4th at 459. On their theory, "so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited." *Id.* at 459–60. The Fourth Circuit disagreed. The court explained that "[j]ust because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms." *Id.* Accepting the appellants' argument would "lead[] to absurd consequences because it totally detaches the Second Amendment's right to keep and bear arms from its purpose of individual self-defense." *Id.* at 460. Weapons that the Second Amendment does not protect, including "the M16, the short-barreled shotgun, the ricin pellet-firing umbrella gun, and the W54 nuclear warhead," could "gain constitutional protection merely because [the weapon] becomes popular before the government can sufficiently regulate it." *Id.* The Fourth Circuit refused to engage in this "trivial counting exercise." *Id.* The number of Americans who owned AR-15-style rifles, for example, did not persuade the *Bianchi* Court that

the AR-15 is in common use for a lawful purpose. As the dissent in *Bianchi* highlighted, data suggest that somewhere between 16 million and 24.6 million Americans own or have owned AR-15-style rifles. *See id.* at 518 & n.58 (Richardson, J., dissenting). Yet for the *Bianchi* majority, these figures did not bring the AR-15 within the Second Amendment's protective scope because the weapon's "military origination, combat-functional features, and extraordinary lethality" make it "ill-suited and disproportionate to fulfilling the Second Amendment's purpose of armed self-defense." *Id.* at 459 (majority opinion). Ultimately, the court held:

> *Bruen*'s admonition that the right to keep and bear arms extends only to those weapons "'in common use' today for self-defense" reflects the fact that the Second Amendment protects only those weapons that are typically possessed by average Americans for the purpose of self-preservation and are not ill-suited and disproportionate to achieving that end.

*Id.* at 461 (quoting *Bruen*, 597 U.S. at 32, 47).

As the Court has already detailed, the machinegun is similarly ill-suited and disproportionate for self-defense. The number of machineguns registered to Americans—a fraction of the number of AR-15-style rifles owned by Americans—does not alter the Court's conclusion that machineguns are dangerous and unusual weapons. Just as the *Bianchi* Court rejected an "ill-conceived popularity test" to determine the scope of the Second Amendment's protections, this Court does as well. *See id.* at 460.

Machineguns are dangerous and unusual weapons whose extraordinarily lethal features make them "ill-suited and disproportionate to the need for self-defense." *Id.* at 441. Accordingly, they "are not within the ambit of the 'right to keep and bear arms' as codified within the plain text of the Second Amendment." *See id.* at 452. Because the plain text of the Second Amendment does not include machineguns, the government may ban their possession. Section 922(o) does not violate the Second Amendment.

### 2. *Bruen* Step Two

Reaching step two of the *Bruen* test is unnecessary because Oxley's facial challenge to § 922(o) fails at step one—machineguns are not protected by the Second Amendment. But even if the Second Amendment did protect machineguns—and it does not—Oxley's challenge to § 922(o) would fail at the second *Bruen* step.

At step two of *Bruen*, the question is whether the government has "justif[ied] its regulation" of conduct covered by the Second Amendment "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 24. In *United States v. Rahimi*, the Supreme Court clarified that at *Bruen* step two, the dispositive question is not whether the challenged regulation is "identical to ones that could be found in 1791." 602 U.S. at 691–92. Rather, the court must determine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. If it is, then the statute is constitutional. *See id.* at 691–92.

*Bianchi* also is instructive at the second step of the *Bruen* analysis. The *Bianchi* Court determined at step one of its *Bruen* analysis that many of the assault weapons covered by the FSA, such as the AR-15, are not protected by the Second Amendment. 111 F.4th at 452. But "[o]ut of respect for" the Supreme Court's remand of the case in the wake of *Bruen*, the Fourth Circuit proceeded to *Bruen*'s second step "to reckon with the tradition of weapons regulation in this country and assess whether the Maryland statute is harmonious with it." *See id.* at 461–72. The *Bianchi* Court concluded that the FSA "is one of many in a storied tradition of legislatures perceiving threats posed by excessively dangerous weapons and regulating commensurately," and that "[t]he Maryland regulation is readily 'consistent with this Nation's historical tradition of firearm regulation.'" *Id.* at 462 (quoting *Bruen*, 597 U.S. at 34).

As an initial matter, the *Bianchi* Court described the difference between "a challenged regulation address[ing] a general societal problem that has persisted since the 18th century" and a regulation that "implicat[es] unprecedented societal concerns or dramatic technological changes." *Id.* at 462–63 (second alteration in original) (quoting *Bruen*, 597 U.S. at 26–27). *Bruen* instructs that when a case involves the former, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 26). The latter, however, may require a court "to take 'a more nuanced approach.'" *Id.* at 463 (quoting *Bruen*, 597 U.S. at 27). The types of weapons covered by Maryland's FSA—"AR-15s and the like"—were "designed to empower an individual soldier to kill as many people in as little time as possible." *Id.* The Fourth Circuit determined that, due to the "[r]apid advancements in gun technology" (which the court deemed a "central cause of th[e] mass carnage" associated with modern mass shootings), the weapons at issue were "not our forebears' arms," and took the more nuanced approach described in *Bruen*. *Id.* at 463–64.

The *Bianchi* Court went on to describe the history of firearm regulation in the United States. Although "[p]re-Revolution . . . there was little regulation of firearms in America," an "exception" was restrictions on gunpowder. *Id.* at 464. The "[a]ggregation of gunpowder concerned colonists as large amounts of the substance 'could kill many people at once if ignited,'" and "[i]n response to this danger—which resulted from the accumulation of firepower disproportionate to the lawful purpose of individual self-defense—a handful of American cities and states restricted the quantity of gunpowder that an individual could possess." *Id.* at 464–65 (quoting *Ocean State Tactical*, 95 F.4th at 49). As technology advanced, guns became more widely available, accurate, and able to "fire multiple rounds without reloading." *Id.* at 465. The development and proliferation of "deadly

yet concealable weapons" used in assaults and homicides led legislatures to act. *Id.* at 466. They "passed restrictions on carry, and, in some cases, outright bans on the possession of certain more dangerous weapons." *Id.* at 466. Laws targeting "excessively dangerous weapons" extended beyond firearms to weapons such as Bowie knives, sword canes, metal knuckles, sand clubs, dirks, and slungshots, which "were particularly suitable for fighting and 'popular[ ] with street criminals.'" *Id.* at 466–67 (alteration in original) (quoting David B. Kopel & Joseph G. S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 345 (2024)). Restrictions on these weapons "ranged from outright bans on their manufacture, sale, and possession; to enhanced criminal penalties for those who used the weapons to commit crimes; to prohibitions on both open and concealed carry." *Id.* at 467. At the turn of the century, "weaponry that empowered individuals to kill many people quickly" emerged, including the semiautomatic firearm towards the end of the 19th Century and the Thompson submachine gun ("Tommy gun") in 1920. *Id.* at 468–69. Thanks to these new entrants, "criminals gained access to weapons with firepower not seen before in civilian life." *Id.* at 469. States responded by enacting anti-machinegun laws and restricting semiautomatic weapons. *Id.* at 470. Congress enacted the National Firearms Act of 1934, significantly limiting civilian possession and transfer of automatic weapons, sawed-off shotguns, short-barreled rifles, and silencers, which, "as the Supreme Court recognized in *Miller* and *Heller* . . . accorded with the historical understanding of the scope of the Second Amendment right." *Id.* (citing *Price*, 111 F.4th at 399–400).

Ultimately, the *Bianchi* Court found that the "strong tradition" of regulating weapons "proven to pose exceptional dangers to innocent civilians" supported Maryland's restrictions on assault weapons. *Id.* at 471. "When violence surged in the public square, states and localities responded by regulating the manner of carry; forbidding brandishing; and banning the sale,

manufacture, and possession of weapons that were particularly useful for offensive and criminal purposes." *Id.* Maryland's restrictions were "yet another chapter in this chronicle" that was "fully consistent with our nation's long and dynamic tradition of regulating excessively dangerous weapons." *Id.* at 472. In reaching this conclusion, the *Bianchi* Court again emphasized that the FSA "regulates weapons that are ill-suited for and disproportionate to the objective of self-defense"—a finding from the first step of the court's *Bruen* analysis. *See id.*

This Court, like the *Bianchi* Court, takes a "nuanced approach" to the inquiry of whether § 922(o) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 24, 27. Section 922(o) bans the possession of machineguns—automatic weapons. Automatic weapons, like semiautomatic assault weapons, are "not our forebears' arms." *Bianchi*, 111 F.4th at 464. Compared to the weapons available at the founding, the machinegun's automatic firing capability presents hazards that "implicat[e]" both "unprecedented societal concerns [and] dramatic technological changes." *See id.* at 463; *see also, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) (noting that "[m]ost guns available [in 1791] could not fire more than one shot without being reloaded" and "large-capacity magazines are more recent developments").

The history and tradition that supports Maryland's restrictions on semiautomatic assault weapons also supports § 922(o)'s restrictions on machineguns. *Bianchi*'s historical survey demonstrates that our nation has long restricted excessively dangerous weapons. These restrictions have targeted, for example, weapons with "firepower disproportionate to the lawful purpose of individual self-defense" and those which are "'popular[ ] with . . . criminals.'" *Bianchi*, 111 F.4th at 465–67 (quoting Kopel & Greenlee, *supra* at 345). As detailed in the Court's *Bruen* step-one analysis, the automatic firing capabilities of machineguns make the weapon "ill-suited for and

disproportionate to the objective of self-defense." *See id.* at 472. And fully automatic weapons, such as the Tommy gun, also have been a feature in some particularly gruesome and notorious criminal activity, including the St. Valentine's Day Massacre and the Kansas City Massacre. *See id.* at 469 (citing Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 63 (2023)). Restrictions on machineguns are therefore "consistent with the principles that underpin our regulatory tradition" of regulating excessively dangerous weapons. *See Rahimi*, 602 U.S. at 692.

The Court's conclusion is bolstered by the more recent history of state and federal machinegun regulations, including outright bans on the possession of the weapon. Between 1925 and 1934, at least 29 states passed anti-machinegun laws. *Bianchi*, 111 F.4th at 470 & n.14 (collecting laws); *see also* ECF 41, at 12–13 (first citing 1927 Ind. Acts 469, Ch. 156, § 1; and then citing 1927 Mich. Pub. Acts 888-89, § 3). Congress regulated the manufacture, importation, sale, transfer, and possession of machineguns under the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236, and later banned possession of machineguns by enacting the provision codified at § 922(o) in the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986). To be sure, these laws were enacted well after the ratification of the Second Amendment, which "codified a *pre-existing* right." *Bruen*, 597 U.S. at 20 (2022) (quoting *Heller*, 554 U.S. at 592). Though "'post-ratification adoption . . . of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text,' . . . these 20th-century enactments . . . trod along a well-worn path" of regulating excessively dangerous weapons. *See Bianchi*, 111 F.4th at 469–70 (quoting *Bruen*, 597 U.S. at 36). Section 922(o) is "fully consistent with our nation's long and dynamic tradition of regulating excessively dangerous weapons." *See id.* at 472.

Oxley argues that history and tradition do not support a ban on the mere possession of a machinegun. Instead, he argues, the Second Amendment permits restrictions only on bearing dangerous and unusual weapons "to terrorize the people." ECF 35, at 7 (quoting *Bruen*, 597 U.S. at 47). Oxley points to laws that restricted dangerous and unusual weapons by targeting the common-law offense of "affray," or "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people.*" *Id.* (quoting *State v. Langford*, 10 N.C. 381, 383–84 (N.C. 1824)). As Oxley points out, the *Bruen* Court considered statutes codifying the common-law offense when it deemed unconstitutional a New York law restricting public carry of handguns and refused to read such statutes as "banning the public carry of all firearms." *See* 597 U.S. at 47. But the common-law offense of affray was far from the only government regulation of dangerous and unusual weapons. The *Bruen* Court acknowledged that "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'—a fact [the Supreme Court] already acknowledged in *Heller*." *Id.* And as the Fourth Circuit confirmed in *Bianchi*, "18th and 19th century legislatures 'passed laws in a number of states that restricted the use *or ownership* of certain types of weapons,'" including "*outright bans* on the[] manufacture, sale, and *possession*" of "excessively dangerous weapons." 111 F.4th at 466–68 (quoting Declaration of Professor Randolph Roth at 20, *Lamont*, 685 F. Supp. 3d 63, No. 22-1118) (emphases added); *see also id.* at 466 (describing how legislatures responded to increases in gun violence and the rise of concealable weapons by "pass[ing] restrictions on carry, and, in some cases, *outright bans on the possession* of certain more dangerous weapons" (emphasis added)). Our nation's historical tradition of regulating excessively dangerous weapons supports a ban on the mere possession of machineguns.

Oxley's insistence that Congress may not prohibit the mere possession of machineguns is also foreclosed by *Bianchi* itself. The *Bianchi* Court considered a statute that prohibited the possession, purchase, receipt, transport, transfer, and sale of certain assault weapons. *Id.* at 442. The Fourth Circuit's inquiry focused on whether "the Second Amendment guarantees the individual right to *possess* the assault weapons covered by the Maryland statute," and the court explained that "[w]hat [it] must do under *Bruen* . . . is assess the historical scope of the right to keep and bear arms to determine whether the text of the Second Amendment encompasses the right to *possess* the assault weapons at issue." *Id.* at 447–48 (emphases added). The *Bianchi* Court also explained that "'dangerous and unusual weapons' that are not 'in common use' can be *prohibited*." *Id.* at 445 (quoting *Heller*, 554 U.S. at 627) (emphasis added); *see also Heller*, 554 U.S. at 626–27 (explaining that the Second Amendment is "not a right to *keep* and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" and indicating that "weapons that are most useful in military service—M–16 rifles and the like—may be *banned*" (emphases added)); *cf. Bruen*, 597 U.S. at 72 (Alito, J., concurring) (noting that the holding of *Bruen* "does [not] decide anything about the kinds of weapons that people may possess" nor "disturb[] anything that [the Supreme Court] said in *Heller* or *McDonald v. Chicago* about restrictions that may be imposed on the possession or carrying of guns." (citation omitted)). Although this language is found in the *Bianchi* Court's step-one analysis, in its step-two inquiry, the court concluded that "[w]hen violence surged in the public square, states and localities responded by regulating the manner of carry; forbidding brandishing; and banning the sale, manufacture, and *possession* of weapons that were particularly useful for offensive and criminal purposes." 111 F.4th at 471 (emphasis added). In short, *Bianchi* confirms that laws which prohibit the mere possession of

excessively dangerous weapons like machineguns are "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 24.

*     *     *

Title 18 U.S.C. § 922(o) regulates conduct that falls outside the scope of the Second Amendment's protection. Even if the Second Amendment extended to machineguns, § 922(o) is consistent with the historical tradition of regulating excessively dangerous weapons. The law is constitutional on its face.

### B. Oxley's As-Applied Challenge

Oxley also mounts an as-applied challenge to § 922(o). An "as-applied" challenge "is 'based on a developed factual record and the application of a statute to a specific person.'" *United States v. Jackson*, 661 F. Supp. 3d 392, 397 (D. Md. 2023) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc)). "When a court reviews an 'as-applied' challenge, it must examine only the application of the law to the particular parties and the facts of the case before it, without considering whether the statute theoretically could be construed as unconstitutional in another hypothetical case." *United States v. Mgmt. Consulting, Inc.*, 636 F. Supp. 3d 610, 619 (E.D. Va. 2022).

Oxley argues that the statute is unconstitutional as applied to him because he is charged with mere possession of a machinegun, not with bearing the weapon in a manner to terrorize the public, and because the type of machinegun he is charged with possessing is, as he sees it, merely a handgun. Neither argument carries the day.

Oxley contends that § 922(o) is unconstitutional as applied to him because he merely possessed the weapon and did not brandish or display it in a manner that terrorized the public. On these facts, Oxley argues, it is unconstitutional to criminalize his conduct. This as-applied

challenge recasts one of the arguments Oxley makes in his facial challenge: that banning the mere possession of a machinegun violates the Second Amendment. This argument fares no better under an as-applied moniker. After all, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew*, 587 U.S. at 138 (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)). To be sure, casting a constitutional claim as an as-applied challenge impacts "how much we consider [the] plaintiff['s] particular identity and circumstances." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 782 (4th Cir. 2023). But here, the only particular circumstance Oxley highlights is that he did not bear the weapon in a manner that would terrorize people. The Court already rejected this argument in Oxley's facial challenge. Banning the mere possession of a machinegun does not run afoul of the Second Amendment. For the same reasons Oxley's facial challenge fails, his as-applied challenge on this basis does as well. *Cf. United States v. Lane*, 689 F. Supp. 3d 232, 250 (E.D. Va. 2023) ("As the Defendant frames his challenge, the answer to whether the Defendant's possession of the Glock switch is protected by the Second Amendment will necessarily be the same as the answer to whether the possession of machineguns is protected by the Second Amendment. For that reason, the Court concludes that the Defendant's as-applied challenge will live or die with his facial challenge."), *appeal pending*, No. 24-4083 (4th Cir.).

In his supplemental briefing, Oxley appears to raise another as-applied challenge. He argues that "the weapon charged in the indictment"—a Glock pistol with a full-automatic switch installed ("switch-equipped Glock pistol")—is a "*handgun.*" *See* ECF 67, at 5–10. As Oxley sees it, this "handgun," which measures 8 x 5.5 inches and weighs approximately two pounds, is "not the kind of 'rifled firearm' that the term 'machinegun' typically evokes." *Id.* at 6. On Oxley's

account, because the Supreme Court has held that the handgun is "'the quintessential self-defense weapon,'" so too is the Glock pistol, which is "operable with only one hand." *See id.* at 6–7 (quoting *Heller*, 554 U.S. at 629).[3]

Oxley's attempts to portray the switch-equipped Glock pistol as the equivalent of a handgun are specious at best. This depiction leaves out a critical feature of the weapon—the full-automatic Glock switch attached to it. The switch-equipped Glock pistol meets the definition of a "machinegun" under § 922(o) because the switch is a "part designed and intended . . . for use in converting a weapon" into a weapon that can fire "automatically more than one shot, without manual reloading, by a single function of the trigger." *See* 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(24). Even if the Glock pistol, unequipped with such a conversion device, is a handgun, "[f]irearms that are originally lawfully purchased are not somehow imbued with constitutional coverage no matter what happens after they leave the dealer." *See Price*, 111 F.4th at 407. For example, "a shotgun becomes contraband once its barrel is modified to be less than eighteen inches." *Id.* at 407–08. As Oxley himself acknowledges, when a Glock switch is attached to a Glock pistol, the pistol can engage in automatic fire. *See* ATF, U.S. Dep't of Just., *Machinegun Conversion Devices Fact Sheet* 1, https://www.justice.gov/usao-wdok/media/1366621/dl?inline

---

[3] In his post-*Bianchi* supplemental briefing, Oxley made this and similar arguments attempting to distinguish the weapon he is charged with possessing from the typical machinegun and the assault weapons at issue in *Bianchi*. The Court construes these arguments as an as-applied challenge to § 922(o). If Oxley meant to raise these arguments in support of his facial challenge, they would fail. To bring a successful facial challenge, Oxley must show that "there is no conceivable weapon, no matter how dangerous, to which the Act's proscriptions can validly be applied." *See Bianchi*, 111 F.4th at 442. For purposes of § 922(o), the term "machinegun" encompasses firearms other than the switch-equipped Glock pistol—including the type of "rifled firearm" that Oxley attempts to differentiate from the weapon he is charged with possessing. *See* 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24). Because the Court has found that there is a "conceivable weapon . . . to which [§ 922(o)'s] proscriptions can validly be applied," *Bianchi*, 111 F.4th at 442, the law is facially constitutional. Oxley cannot avoid this conclusion by showing that § 922(o) is unconstitutional as applied to one firearm.

[https://perma.cc/N7VN-UXQ5] (last visited Aug. 8, 2025; *United States v. Fisher*, No. 23-0045, 2024 WL 589115, at *2 (W.D.N.C. Feb. 13, 2024). Yet Oxley responds that "this feature, standing alone, is insufficient to convert a handgun . . . into an '*excessively* dangerous' firearm that is 'ill-suited and disproportionate to the need for self-defense.'" ECF 67, at 8 (quoting *Bianchi*, 111 F.4th at 441). But as the Court's rejection of Oxley's facial challenge makes clear, automatic firing capability is exactly what makes a machinegun excessively dangerous and "ill-suited and disproportionate to the need for self-defense." *See Bianchi*, 111 F.4th at 441. Though a switch-equipped Glock pistol may "not [be] the kind of 'rifled firearm' that the term 'machinegun' typically evokes," *see* ECF 67, at 6, its automatic firing capability renders it just as ill-suited for self-defense as a "typical" machinegun.

Glossing over the weapon's automatic firing capability, Oxley insists that a Glock pistol is "well-suited to self-defense" because it is "lightweight, easy to access in an emergency, and operable with only one hand." ECF 67, at 7. Again, the weapon at issue is a Glock pistol *with a full-automatic switch installed*. Its small size does not make the weapon's force proportionate and suitable for self-defense. *Cf. Bianchi*, 111 F.4th at 451 ("Everyone can also agree, we hope, that a nuclear weapon such as the . . . 51-pound W54 warhead, can be reserved for the military, even though it is light enough for one person to carry." (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023)). A Glock switch transforms what may be considered a handgun into a weapon that can engage in uninterrupted fire with "a single pull of the trigger." *See Staples*, 511 U.S. at 602 n.1. That "ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection" places the switch-equipped Glock pistol "beyond the scope of the Second Amendment" and "separates [it] from the handgun." *See Bianchi*, 111 F.4th at 451. What's more, the comparatively small size of the Glock pistol makes it "more difficult to control, and

therefore more dangerous [than a typical machinegun] once a Glock Switch is added." *Fisher*, 2024 WL 589115, at *2. Further, a weapon's small size may make the firearm more suitable for criminal activity—another characteristic that brings a weapon "beyond the scope of the Second Amendment." *See Bianchi*, 111 F.4th at 451 (describing how sawed-off shotguns and short-barreled rifles "'are more easily concealable than long-barreled rifles but have more destructive power than traditional handguns,' making them particularly desirable to malefactors and crooks" (quoting Press Release No. 23-41, U.S. Dep't of Just., Justice Department Announces New Rule to Address Stabilizing Braces, Accessories Used to Convert Pistols into Short-Barreled Rifles (Jan. 13, 2023))); *accord Johnson v. United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting) (noting that sawed-off shotguns "are uniquely attractive to violent criminals" because they are "[m]uch easier to conceal than long-barreled shotguns used for hunting and other lawful purposes," "can be hidden under a coat, tucked into a bag, or stowed under a car seat," and "like a handgun, they can be fired with one hand—*except to more lethal effect*" (emphasis added)).

Oxley also argues that the switch-equipped Glock pistol is well-suited to self-defense because it lacks many of the characteristics of the Barrett sniper rifle and the AR-15 featured in *Bianchi*. This argument fails. For one thing, as already explained, the *Bianchi* Court identified a characteristic that the switch-equipped Glock pistol shares with the AR-15—the ability to engage in "rapid and uninterrupted discharge of many shots." 111 F.4th at 459 (quoting *Ocean State Tactical*, 95 F.4th at 45). For another, a weapon may be dangerous and unusual even if it does not share the exact characteristics of another weapon deemed so. Though characteristics of assault weapons like the AR-15 and the Barrett sniper rifle are *sufficient* to make the weapon dangerous and unusual, all of those characteristics are not *necessary* for any weapon to be considered dangerous and unusual.

A short-barreled shotgun, for example, is not protected by the Second Amendment, and it bears even less resemblance to the assault weapons that Oxley strives to distinguish. In *Miller*, the Supreme Court rejected a Second Amendment challenge to an indictment based on a statute restricting the transport of short-barreled shotguns. 307 U.S. at 178. The Supreme Court reaffirmed in *Heller* that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," and explained "that [this] limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 625, 627. *Miller* remains good law after *Bruen*. *See Price*, 111 F.4th at 399–400; *Bianchi*, 111 F.4th at 445; *cf. Simmons*, 143 F.4th at 207. Under *Miller*, as reaffirmed in *Heller*, *Price*, and *Bianchi*, short-barreled shotguns are not protected by the Second Amendment—and neither is the fully automatic weapon Oxley is charged with possessing. These weapons are not suitable for self-defense simply because they lack certain features of the assault weapons held ill-suited for this purpose in *Bianchi*.

The Fourth Circuit's recent decision in *United States v. Simmons* supports the Court's conclusion. In *Simmons*, a defendant who pled guilty to possession of "auto sears"—"a device that enables semi-automatic firearms to fire at the same rate as machineguns"—brought a Second Amendment challenge to a sentencing enhancement for his possession of a weapon restricted by the National Firearms Act. 143 F.4th at 203–04. Two of the auto sears at issue were Glock switches. *See id.* at 204 n.1. The Fourth Circuit rejected Simmons's Second Amendment challenge in part because Simmons conceded that "the Second Amendment does not protect *anyone*'s right to possess" a firearm restricted by the National Firearms Act. *Id.* at 207. However, the Court stated that "[e]ven if Simmons had not made this concession," his constitutional challenge would fail. *Id.* The *Simmons* Court explained that "'machineguns are not in common use for a lawful purpose,'"

and thus do not "enjoy Second Amendment protection." *Id.* (quoting *Price*, 111 F.4th at 403). Because "an auto sear . . . is a part that converts a semiautomatic weapon into a machinegun," and "Simmons d[id] not challenge the Government's classification of auto sears as machineguns," both *Miller* and *Heller* "would foreclose any constitutional challenge to his possession of auto sears" "unless auto sears are entitled to Second Amendment protection that machineguns lack." *Id.* The Fourth Circuit assumed, even if it did not explicitly decide, that just as machineguns do not receive Second Amendment protection, neither do "part[s] that convert[] a semiautomatic weapon into a machinegun." *See id.* If *Heller* and *Miller* foreclosed Simmons's Second Amendment challenge, they also foreclose Oxley's. Other courts have reached similar conclusions. *See, e.g.*, *United States v. Mitchell*, 734 F. Supp. 3d 702, 709–10 (N.D. Ohio 2024) (collecting cases "involving possession of [G]lock switches or similar conversion devices" where the court "rejected constitutional challenges to § 922(o)").

The switch-equipped Glock pistol is a dangerous and unusual weapon that is not covered by the plain text of the Second Amendment. This fully automatic weapon is not suitable and proportionate for self-defense, and banning its possession is consistent with the nation's historical tradition of regulating excessively dangerous weapons.

Section 922(o) is constitutional as applied to Oxley.

## IV.    Conclusion

The Second Amendment does not guarantee a right to possess machineguns, including a switch-equipped Glock pistol. Even if these firearms were covered by the plain text of the Second Amendment, a ban on their possession is consistent with our nation's historical tradition of restricting access to excessively dangerous weapons. Title 18 U.S.C. § 922(o) is constitutional on its face. It is also constitutional as applied to Oxley. Oxley's motion to dismiss the indictment is

denied. A separate Order follows.

Date: August 8, 2025

_____
Deborah L. Boardman
United States District Judge